UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,

  *Plaintiff*,

v().                                      Case No. SA-21-CR-00399-JKP

(1) LANE EVERETT GRINAGE,

  *Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Lane Everett Grinage's motion to withdraw his guilty plea and dismiss the indictment, the Government's response, Grinage's reply, and Grinage's supplemental briefing. ECF Nos. 38, 42, 44, 45. For the reasons discussed herein, the Court **DENIES** Grinage's motion.

## BACKGROUND

This criminal matter arises from a traffic stop in which law enforcement officers searched Grinage's vehicle and found a Glock handgun in the center console. Grinage, a convicted felon, told one of the officers he had the firearm for protection. On September 15, 2021, a grand jury returned an indictment charging Grinage with knowingly possessing a firearm after conviction of a crime punishable by more than one year in prison, in violation of 18 U.S.C. 922(g)(1), colloquially known as the "felon in possession" statute. ECF No. 3. Grinage pleaded guilty on April 6, 2022. After he pleaded guilty, the United States Supreme Court clarified the framework for assessing a firearm regulation's constitutionality under the Second Amendment in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Grinage now argues the Court

should allow him to withdraw his guilty plea and dismiss the indictment because, under the *Bruen* framework, § 922(g)(1) is unconstitutional both facially and as applied to Grinage.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 11(d) allows a defendant to withdraw his or her guilty plea "after the court accepts the plea, but before it imposes sentence if … the defendant can show a fair and just reason for requesting the withdrawal." To determine whether a defendant may withdraw a guilty plea, courts consider the following factors: (1) whether the defendant has asserted his innocence; (2) whether the government would suffer prejudice if the withdrawal motion were granted; (3) whether the defendant delayed in filing his motion; (4) whether the withdrawal would substantially inconvenience the court; (5) whether close assistance of counsel was available to the defendant; (6) whether the original plea was knowing and voluntary; and (7) whether withdrawal would waste judicial resources. *United States v. Strother*, 977 F.3d 438, 443 (5th Cir. 2020) (citing *United States v. Carr*, 740 F.2d 339, 343–33 (5th Cir. 1984)). While not all changes in the law merit the withdrawal of a guilty plea, it is appropriate where intervening law calls into question whether the defendant's conduct could lawfully support the charged offense. *United States v. Presley*, 478 F.2d 163, 167–68 (5th Cir. 1973); *cf. United States v. Andrade*, 83 F.3d 729, 731–32 (5th Cir. 1996).

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* Fed. R. Crim. P. 12(d) (permitting a court to rule on a motion involving factual issues provided the court states its essential findings on the

record). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *Flores*, 404 F.3d at 325.

In this case, Grinage argues the *Bruen* decision constitutes an intervening change in law which renders § 922(g)(1) unconstitutional. Specifically, he argues § 922(g)(1) deprives him of a right rooted in the Second Amendment's text, as informed by history. The question before the Court, therefore, is whether the *Bruen* decision represents such a change in law. The Government contends it does not, and, for the reasons that follow, this Court agrees.

## DISCUSSION

The Second Amendment to the Constitution states "a well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 635 (2008). In so doing, the *Heller* Court rejected earlier interpretations of the Second Amendment which limited its application to militia members, finding the Second Amendment guarantees an individual's right to keep and bear arms, unconnected to militia service. *Id*. at 592. The Court reached its conclusion by employing a textual analysis, informed by history. *Id*. at 576–577, 592. Two years later, in *McDonald v. Chicago*, the Supreme Court held the Second Amendment applies to the states through the Fourteenth Amendment. 561 U.S. 742, 767 (2010).

Following *Heller*, the Fifth Circuit, like other circuits, applied a two-step inquiry for assessing the constitutionality of firearms restrictions. First, courts would determine whether the regulation fell within the scope of the Second Amendment right, looking to the text and historical

tradition to inform their analysis. *United States v. McGinnis*, 956 F.3 747, 754 (5th Cir. 2020). If the regulation was outside the scope of the Second Amendment, then the law was constitutional. *Id*. If it was inside the scope of the Second Amendment, courts would apply means-end scrutiny to assess its constitutionality. *Id*. In *Bruen*, the Supreme Court declared the two-step inquiry to be "one step too many." 142 S. Ct. at 2127. The *Bruen* Court indicated its earlier rulings do not support applying means-end scrutiny, but only "a test rooted in the Second Amendment's text, as informed by history." *Id*. Therefore, to the extent pre-*Bruen* cases relied on textual and historical analysis to find firearms restrictions constitutional, those cases are still good law.

In the Fifth Circuit, recognition that the Second Amendment protects an individual's right to keep and bear arms predates *Heller*. In 2001, seven years before *Heller*, the Fifth Circuit in *United States v. Emerson* held the Second Amendment protects an individual's right to privately possess and bear firearms. 270 F.3d 203, 260 (5th Cir. 2001). The *Emerson* opinion says the Second Amendment right is not unlimited, but rather subject to certain restrictions consistent with the right "as historically understood in this country." *Id*. at 261. Specifically, it says, "it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." *Id*. The *Emerson* opinion describes the right to possess firearms as a common law right that preceded the Constitution, which the Framers understood to exclude felons. *Id*. at 226 n. 21. The Supreme Court in *Heller* arrived at the same conclusion, validating the "presumptively lawful" and "longstanding" prohibition on possession of firearms by felons. 554 U.S. at 626–27 n. 26.

When the Fifth Circuit has specifically assessed the federal felon in possession statute, § 922(g)(1), after *Heller*, it has found, consistent with its earlier findings, the statute is constitutional. *See United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (relying on

*United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009), cert. denied, 557 U.S. 913 (2009)). In this case, Grinage suggests such Fifth Circuit precedent is upset by *Bruen* to the extent the Fifth Circuit relied on the now-defunct, means-end scrutiny analysis to find § 922(g)(1) constitutional. However, the case law does not support Grinage's premise that the Fifth Circuit relied on means-end scrutiny to find § 922(g)(1) constitutional. The *Emerson* opinion, like *Heller*, relied on text and history. More recently, the Fifth Circuit applied means-end scrutiny only reluctantly and arrived at the same conclusion yielded by its historical analysis—that is, it found certain restrictions on the Second Amendment right are constitutional. *See e.g., United States v. McGinnis*, 956 F.3d 747, 755 (5th Cir. 2020).

In the Fifth Circuit, district courts are "bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court." *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)). Nothing in the *Bruen* decision calls into question the precedential effect of Fifth Circuit decisions finding § 922(g)(1) constitutional based on the Second Amendment's text and history. In *Scroggins* and *Anderson*, the Fifth Circuit relied on a textual and historical analysis to find § 922(g)(1) constitutional. 599 F.3d 433; 559 F.3d 348. Therefore, § 922(g)(1) remains constitutional under binding Fifth Circuit authority.

The Court's analysis could end there; however, in the interest of being thorough, the Court also addresses Grinage's specific arguments supporting his facial and as applied challenges to § 922(g)(1) under the *Bruen* decision.

### I.   Grinage's Facial Challenge to §922(g)(1)

A facial challenge is an attack on a statute itself as opposed to a particular application. Such challenges are "the most difficult … to mount successfully," *United States v. Salerno*, 481

5

U.S. 739, 745 (1987). In bringing a facial challenge, the movant must establish the statute "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). "Facial challenges are disfavored for several reasons." *Id*. at 450. Such challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id*. (citing *Ashwander v. TVA*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring)). Courts must bear in mind "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id*. (citing *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006)). The judicial power vested in courts by Article III does not include the power to veto statutes—and that is by design. *NetChoice, LLC v. Paxton*, 49 F.4th 439, 448 (2022). The Framers considered giving courts the power to veto statutes and decided against it. *Id*. As a result, when courts find a statute unconstitutional, they cannot void it, but they can decline to enforce it in a "particular case or controversy" and enjoin executive officials from enforcing it more broadly. *Borden v. United States*, 141 S.Ct. 1817, 1835–36 (Thomas, J., concurring). In other words, "[c]ourts have no authority to strike down statutory text" and "a facial challenge, if successful, has the same effect as nullifying a statute." *Id*.

### A. Effect of the *Bruen* Decision

In this case, Grinage argues § 922(g)(1) is facially unconstitutional under the textual and historical analysis applied in *Bruen*. Specifically, Grinage urges this Court to apply the *Bruen* framework, under which, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126. Finding the conduct at issue in *Bruen* presumptively protected, the Supreme Court then shifted

the burden to the Government to "demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Id*. Applying this analysis, Grinage argues the plain text of the Second Amendment covers the conduct at issue in § 922(g)(1)—possession of a firearm—so the conduct is presumptively protected. Grinage further contends the Government cannot meet its burden, under the *Bruen* framework, to demonstrate § 922(g)(1) is consistent with the Nation's historical tradition of firearms regulation. Grinage's argument is flawed, however, because he assumes *Bruen* limited the analysis of a statute's constitutionality under the Second Amendment to the regulated "conduct" at issue. *Bruen* made no such pronouncement.

At issue in *Bruen* was the constitutionality of New York State's firearms licensure regime, which conditioned issuance of a license to carry a firearm on a citizen's showing of a special need for self-defense. *Bruen*, 142 S. Ct. at 2122. New York refused to license the individual *Bruen* petitioners because they failed to establish any unique danger to their personal safety. *Id*. at 2125. The question before the *Bruen* Court was whether the regulated conduct—carrying a weapon outside the home for self-defense—was protected by the Second Amendment and, if so, whether New York's licensing regime impermissibly infringed upon that right. Applying a textual and historical analysis, the *Bruen* Court answered both questions affirmatively, holding "[b]ecause the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense … the State's licensing regime violates the Constitution." *Id*. at 2122.

The question before this Court is different. Here, Grinage challenges the constitutionality of the federal felon in possession statute, § 922(g)(1), which makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess a firearm. That is, § 922(g)(1) prohibits any person who is a

convicted felon from possessing a firearm. Under *Heller* and its progeny, possession of a firearm is by definition the type of "conduct" protected by the Second Amendment. 554 U.S. at 582 ("…the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"). Thus, the constitutional question in this case is not whether § 922(g)(1) restricts protected conduct, but rather whether it impermissibly restricts protected conduct based on the status of the person. Specifically, this Court must answer whether felons are included in "the people" protected by the Second Amendment.

The *Bruen* Court had no reason to consider whether the people restricted by the New York statute were "the people" eligible for Second Amendment protection. Indeed, the parties agreed the *Bruen* petitioners were "two ordinary, law-abiding, adult citizens," and therefore "part of 'the people' whom the Second Amendment protects." *Id*. at 2134. Furthermore, the *Bruen* petitioners never argued New York impermissibly limited the type of person eligible for licensure. The New York statute required only that an applicant be a person "of good moral character" with "no history of crime or mental illness" to obtain a license. *Id*. at 2123. As "ordinary, law-abiding citizens," the *Bruen* petitioners were presumptively the type of people eligible for a New York license to carry. *Id*. at 2134. The *Bruen* opinion, therefore, did not address "the people" who are eligible for Second Amendment protection—but the *Heller* opinion did.

### B. Effect of the *Heller* Decision

Before the *Heller* Court was the constitutionality of a Washington, D.C., licensure regime which banned all handguns and required any licensed firearms in the home to be kept nonfunctional. 554 U.S. at 574. To assess the D.C. regime's constitutionality, the *Heller* Court started by interpreting the meaning of the Second Amendment. *Id*. at 576. In so doing, it found a

"strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id*. at 581. According to *Heller*, "the people" in the Second Amendment refers "to all members of the political community, not an unspecified subset." *Id*. at 580. In this case, Grinage relies on this presumption in *Heller* to argue all people, including convicted felons, are covered by the Second Amendment's text; however, Grinage misreads *Heller*. The section of the *Heller* opinion which says "the people" means "all members of the political community" was discussing whether the term applies to individual or collective rights. *Id*. at 579–81. Specifically, the *Heller* Court found the use of the term "the people" suggests the framers' intent to protect an individual right, independent of militia service. *Id*. The *Heller* Court goes on to note, however, that "[o]f course the right was not unlimited…" *Id*. at 595.

Later in the *Heller* opinion, the Supreme Court expanded on its statement that the Second Amendment right is not unlimited. *Id*. at 626–28. Courts and commentators "[f]rom Blackstone through the 19th-century," it wrote, agree "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626. The *Heller* Court goes on to say, although it has not undertaken a thorough analysis of the Second Amendment's scope, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on commercial sale of arms." *Id*. at 626–27. In a footnote, the *Heller* Court says these "presumptively lawful" measures are an illustrative, not exhaustive list. *Id*. at 627 n. 26.

So, the *Heller* opinion includes two presumptions regarding "the people" protected by the Second Amendment: (1) "the people" refers "to all members of the political community, not an

9

unspecified subset" and (2) certain restrictions, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," are "presumptively lawful." *Id*. at 580, 626–27 n. 26. Grinage urges this Court to rely on the first presumption to find felons are included in "the people" protected by the Second Amendment—but decline to follow the second presumption which says felons are not included, because it is dicta. This Court finds both presumptions are dicta and, therefore, deserving of equal weight. This is particularly true where, as here, the second presumption is intended to define the limits of the first. In any event, courts "are generally bound by Supreme Court dicta, especially when it is recent and detailed," as is the case here. *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016).

Subsequent Supreme Court opinions do not disturb *Heller*'s presumption that restricting felons' possession of firearms is constitutional. Two years after *Heller*, in *McDonald*, the Supreme Court reaffirmed its statement that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" 561 U.S. at 786 (citing *Heller*, 554 U.S. at 626–27.). In *Bruen*, the Supreme Court did not directly address restrictions on "the people" protected by the Second Amendment because, as discussed above, that question was not at issue in the case. Still, *Bruen* characterizes its holding as "in keeping with *Heller*" and makes a point of repeatedly referring to the Second Amendment right afforded "law-abiding citizens." 142 S. Ct. at 2126. Furthermore, in their concurring opinions to the *Bruen* opinion, Justices Kavanaugh and Alito affirm the Supreme Court's statement in *Heller* with respect to felons. *Id*. at 2162 (Kavanaugh, J., concurring); *id*. at 2157 (Alito, J., concurring). This Court, therefore, finds no reason to question *Heller*'s finding that restricting felons' possession of firearms is constitutional.

Here again, the Court could conclude its inquiry. Though it has never ruled on the constitutionality of § 922(g)(1) specifically, the Supreme Court has consistently indicated the law's purpose—prohibiting possession of firearms by felons—is constitutional. Taken together with binding Fifth Circuit authority holding § 922(g)(1) constitutional, this Supreme Court precedent leads the Court to conclude convicted felons like Grinage are not included in "the people" protected by the Second Amendment. The Court, therefore, finds Grinage cannot meet his burden to demonstrate § 922(g)(1) "is unconstitutional in all of its applications"—and his facial challenge fails. *Wash. State Grange*, 552 U.S. at 449.

Indeed, as the Government points out in its brief, district courts across the country have consistently rejected *Bruen* challenges to § 922(g)(1).[1] On November 16, 2022, a Third Circuit Panel issued the first circuit decision considering a *Bruen* challenge to § 922(g)(1), ultimately rejecting it. *See Range v. Attorney General*, — F.4th —, 2002 WL 16955670 (3rd Cir. 2022). Grinage offers no authority to the contrary, nor has this Court found any. Many of the courts rejecting *Bruen* challenges to § 922(g)(1) have undertaken the historical analysis employed by *Heller* and *Bruen*. In response to Grinage's contention that the Government cannot meet its burden to demonstrate § 922(g)(1) is consistent with the Nation's historical tradition of firearms regulation, the Court briefly summarizes that history below.

---

[1] *See e.g., United States v. Collette*, No. 22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 21-CR-107-WQH, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Cockerham*, No. 21-CR-6-DCB-FKB, 2022 WL 4229314 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. CR 21-51 (DWF/TNL), 2022 WL 4226229 (D. Minn. Sept. 13, 2022); Order Denying Mot. to Dism., *United States v. Doty*, No. 21-CR-21-JPB-JPM (N.D. W. Va. Sept. 9, 2022), ECF No. 34; *United States v. Burrell*, No. 21-20395, 2022 WL 4096865 (E.D. Mich. Sept. 7, 2022); Order Denying Mot. to Dism., *United States v. Nevens*, No. CR-19-774-DMG (C.D.C.A. Aug. 15, 2022), ECF No. 121; Order re: Mot. to Withdraw Guilty Plea and Dismiss the Indictment, *United States v. Ramos*, No. CR 21-395-RGK (C.D.C.A. Aug. 15, 2022), ECF No. 31; *United States v. Ingram*, No. CR 18-557-MGL-3, 2022 WL 3691350 (D.S.C. Aug. 25, 2022).

### C. Historical Analysis

The *Bruen* opinion described *Heller's* methodological approach as follows: First, the Supreme Court conducted a textual inquiry into the "normal and ordinary" meaning of the Second Amendment, finding it guarantees an individual right to possess and carry weapons. *Bruen*, 142 S.Ct. at 2127 (citing *Heller*, 554 U.S. at 576–78). Next, the Court assessed whether its conclusion was supported by the historical record, finding the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited by our English ancestors." *Id*. (quoting *Heller* at 599). In so doing, the Court found further support for its conclusion in "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Id*. (citing *Heller* at 600–01, 605). This is the method *Bruen* encouraged courts to employ, characterizing it as an assessment of modern firearms laws' consistency with "the Second Amendment's text and historical understanding." *Id*. at 2131. The Court noted that, "[i]n some cases, that inquiry will be fairly straightforward." *Id*.

Such is the case here, where the historical record supports the conclusion that "the people" who are protected by the Second Amendment do not include felons. Indeed, Colonial and English societies of the 18th century understood the common law right to bear and keep arms to exclude felons, children, people with mental illness, and other people who lacked capacity. *See* T. Cooley, *A Treatise on Constitutional Limitations* 57 (7th ed. 1903). Colonial Americans "continued some English arms traditions, including the tradition of disarming those perceived as dangerous." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wy. L. Rev. 249, 264–65 (2020). During the

ratification debates, an essay the Supreme Court in *Heller* characterized as "highly influential" to the adoption of the Second Amendment stated, "the people have a right to bear arms … and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." Bernard Schwartz, *The Bill of Rights: A Documentary History* 655 (1971) (citing *Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania and their Constituents*). Indeed, courts have found a "longstanding tradition in English and American law of disarming even non-violent individuals whose actions demonstrated a disrespect for the rule of law as embodied in the sovereign's binding norms." *Range v. Attorney General*, 2002 WL 16955670 at *12. This understanding of the limits of the Second Amendment "comports with the Lockean principles that animated Founding-era disarmaments of individuals whose unwillingness to abide by communal norms placed on them outside of political society." *Id*. at *15.

To be sure, categorically excluding certain groups of people from exercising their Second Amendment right risks frustrating the amendment's purpose. Colonists sought codification of their right to keep and bear arms because they were concerned about disarmament of political dissidents. The English precursor to the Second Amendment was adopted because, "[b]etween the Restoration and the Glorious Revolution, the Stuart Kings Charles II and James II succeeded in using selected militias loyal to them to suppress political dissidents, in part by disarming their opponents." *Heller*, 554 U.S. at 592. Similarly, "what the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists." *Id*. at 594. During the ratification debates, "the fear that the Federal Government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric." *Id*. at 598.

Civil War history illustrates the validity of the Framers' concerns about disarmament of political dissidents. Prior to the Civil War, "[a]ntislavery advocates routinely invoked the right to bear arms for self-defense," and met resistance for doing so. *Id*. at 609. After the Civil War, "[b]lacks were routinely disarmed by the Southern States." *Id*. at 614. During the Reconstruction Era, the Federal government engaged in an effort to protect the Second Amendment rights of freed blacks. A joint Congressional report found disarmament of blacks in the South "is in direct violation of their personal rights as guaranteed by the Constitution of the United States, which declares that 'the right of the people to keep and bear arms shall not be infringed.'" *Id*. at 615 (*citing* Joint Comm. on Reconstruction, H.R.Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 229 (Proposed Circular of Brigadier General R. Saxton)). Congress attempted to protect blacks' Second Amendment rights through passage of the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1871, and ratification of the Fourteenth Amendment. *Id*. at 615–16.

To the extent that the purpose of the Second Amendment is to protect political dissidents and politically vulnerable groups from government infringement on their right to keep and bear arms; however, felons are not among the people who can rely on the historical record to claim such protection. Their exclusion is based on the perception that they pose a danger to society, independent of their political views. That is why the common law right, as it was historically understood, was limited to "law-abiding, responsible citizens." *Id*. at 635.

Grinage would have the Court disregard this history because the modern felon in possession law is relatively new. Indeed, Congress enacted the first version of the federal firearm ban for violent felons in 1938, expanded the law to include non-violent felons in 1961, and expanded it again to cover all possession in 1968. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850 § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat.

757 (repealed); Gun Control Act of 1968, Pub. L. No. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928). According to Grinage, because §922(g)(1) was enacted in the 20th century, and the Government cannot point to a similar founding era law, the Government cannot meet its burden to demonstrate the law's historical basis. Grinage's view, however, misreads *Heller* and *Bruen*, which allow for "reasoning by analogy" to determine the relevant similarity between a modern statute and its historical analogue. *Bruen*, 142 S.Ct. at 2132. *Bruen* characterized such analogical reasoning as "neither a regulatory straightjacket nor a regulatory blank check." *Id*. at 2133. It said the Government need only provide "a well-established and representative historical analogue, not a historical twin." *Id*. Here, the Government meets its burden by establishing § 922(g)(1) is firmly rooted in this Nation's historical tradition, at common law, of excluding felons from "the people" protected by the Second Amendment. Grinage's facial challenge, therefore, fails.

## II.   Section 922(g)(1) As Applied to Grinage

Grinage asks this Court—if it finds § 922(g)(1) facially constitutional, which it has—to find § 922(g)(1) unconstitutional as applied to him. "It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (internal quotation marks omitted). In this case, Grinage argues firearms restrictions imposed on nonviolent offenders like him are inconsistent with the Nation's historical traditions, and § 922(g)(1), therefore, violates the Second Amendment as applied to him. The Government challenges Grinage's contention that he is a nonviolent offender; however, for the sake of argument, the Court will assume he is.

Grinage relies on a pre-*Bruen* Third Circuit opinion which found certain state offenses supporting conviction under § 922(g)(1) were not sufficiently serious to deny the challengers'

Second Amendment rights. *Binderup v. Attorney General*, 836 F.3d 336 (3rd Cir. 2016). After Grinage filed his motion, however, the Third Circuit abrogated its earlier decision, finding even nonviolent offenses can give rise to constitutionally-sound disarmament under § 922(g)(1). *Range v. Attorney General*, 2002 WL 16955670 at *16. In *Range*, the Third Circuit conducted a historical analysis and found, between the 17th and 19th centuries, nonviolent offenders were repeatedly disarmed because legislatures believed they "lacked respect for the rule of law and thus fell outside the community of law-abiding citizens." *Id*. at *14. The *Range* court held, therefore, the challenger's charge of "illicitly taking welfare money through fraudulent misrepresentation" evinces "disrespect for the rule of law" sufficient to justify his disarmament. *Id*. at *16. So, Grinage cannot rely on Third Circuit caselaw to support his as-applied challenge because the Third Circuit no longer views disarmament of nonviolent offenders as unconstitutional.

Grinage further points to a dissenting opinion written by Supreme Court Justice Amy Coney Barrett when she was a member of the Seventh Circuit, in which she found historical evidence for the prospect that people could only be stripped of their Second Amendment rights if they were proven to be dangerous. *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting). In her dissent, Justice Barrett rejected the virtue limitation adopted by the Third Circuit in *Range*. From her perspective, the *Heller* opinion foreclosed the "civic right" argument on which a virtue limitation depends, and the government, therefore, is required to show nonviolent felons have a propensity for dangerous behavior before it can disarm them. *Id*. at 468–69. Whether Justice Barrett still holds that view is unclear. What is clear is the Supreme Court has not yet opined on the question—and an out-of-circuit, dissenting opinion written

16

before the *Bruen* decision was issued is insufficient authority to find a statute unconstitutional, even as applied in this instance.

Judicial restraint requires courts to avoid constitutional questions where possible. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that [courts] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). In this case, the court finds overwhelming authority—by the Fifth Circuit and the Supreme Court—in favor of upholding the constitutionality of § 922(g)(1). The Court, therefore, resolves this matter consistent with that authority. Section 922(g)(1) is constitutional both facially and as applied to Grinage, and his motion fails.

## CONCLUSION

The Court finds the *Bruen* decision does not constitute an intervening change in law which renders § 922(g)(1) unconstitutional either facially or as applied to Grinage. Therefore, Grinage's motion to withdraw his guilty plea and dismiss the indictment (ECF No. 38) is **DENIED**.

It is so ORDERED.
SIGNED this 5th day of December, 2022.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE